**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Jeffrey Zivkovic, | ) | CASE NO. 1:05 CV 2021 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| vs. | ) | |
| | ) | |
| Juniper Networks, Inc., | ) | <u>Memorandum of Opinion and Order</u> |
| | ) | |
| Defendant. | ) | |

<u>Introduction</u>

This matter is before the Court upon defendant's Motion for Summary Judgment (Doc. 20).  This case alleges age discrimination in employment.  For the following reasons, the motion is GRANTED.

<u>Facts</u>

Plaintiff, Jeffrey Zivkovic (DOB 10/21/53), filed this Complaint against his former employer, defendant, Juniper Networks, Inc. (hereafter, defendant or Juniper).  Plaintiff had been employed by Netscreen Technologies, a computer technology company, as an account executive, since July 2002.  Plaintiff's job duties at Netscreen were "to recruit channel

1

partners, service the channel partners, dispense marketing plan to the channel partners[,] [f]ocus on end user sales, sell across all product lines, [and ] develop[e] business relationships to key accounts...”  (pltf. depo. 19; Doc. 28 Ex. C)

Juniper acquired Netscreen in May 2004.  (Kevin Hollenbach depo. 44, 47) Juniper is “a technology-based company which sells products relating to network infrastructure, network security and application performance.”  (Hollenbach aff.)  For Ohio, Juniper’s sales structure is split into two territories: Northern (encompassing territory north of Dayton) and Southern (encompassing areas south of Dayton and including Kentucky). Until June 1, 2006, each territory had only one salesperson.  Juniper does 99% of its business in the enterprise market through channel partners, i.e., companies that have accepted Juniper’s terms to become a partner/reseller of Juniper products into the market.  (*Id.*)

From July 2004 through mid-February 2005, plaintiff reported directly to Jim Pickering (DOB 5/12/75), who reported to Monte Sjobakken (DOB 8/26/65).  (pltf. depo. 76, 56; Ann LaPorte decl.)  Plaintiff achieved his sales quota for 2004's third and fourth quarters, but not for the first two.  (pltf. depo. 118)

By e-mail message of December 7, 2004, Pickering notified Ann LaPorte in Human Resources that he “need[ed] to know what specific formalities we should take for [plaintiff’s] removal and to find his replacement.”  Pickering identified reasons for his decision: “poor sales performance,” “not knowing his business,” “severe lack of product knowledge,” “lack of ability to inspire/influence/create excitement,” “trouble getting along with others” and “lack of ability to sell through a channel.”  Pickering stated that Sjobakken and Chris Andrews (position unknown) were in agreement with his conclusions.  The e-mail indicated that

2

plaintiff was on a

> verbal plan last quarter and was told that he needed to hit his numbers or he would be
> put on a formal PIP (performance improvement plan).  He did end up of hitting his
> numbers last quarter (was around 110% or so) for his firewall number[1].  Now I believe
> we are in a similar situation for this quarter...

(Doc. 28 Ex. 14)

Pickering testified that he had been frustrated with plaintiff on his sales performance and that a "verbal plan" refers to an informal conversation with plaintiff such as "hey, buddy, let's pick it up, you know.  You're under and you got to do better, something like that, not any kind of plan."  (Pickering depo. 33-36)

As a result of Pickering's e-mail, LaPorte instructed her subordinate, Lisa Balkus, to assist Pickering with a 30 day PIP.  (Doc. 28 Ex. 14; LaPorte depo. 148)

Pickering testified that the purpose of a PIP was to help the employee improve and correct things that he is doing poorly.  (Pickering depo. 31) LaPorte also testified that the goal of the PIP is not to terminate the employee but to ensure his success.  (LaPorte depo. 65)

Beginning on December 9, 2004, and through early January 2005, Pickering began exchanging drafts of the PIP with Balkus.  (Doc. 20 Exs. K-M) Balkus approved the written PIP on January 13, 2005, but did not approve a method of delivery of the PIP.   (Doc. 28 Ex. 18; Balkus depo. 35-36)

On January 13, 2005, Pickering met with plaintiff.  Following is plaintiff's testimony as to what occurred at the meeting.  Pickering had requested that he accompany plaintiff on sales calls that day.  Pickering suggested stopping for coffee and on the way into the Caribou

---

[1]     Firewall refers to a product sold by Juniper.  (LaPorte depo. 148)

3

coffee shop in Beachwood, Pickering turned to plaintiff and said, "You're not going to be part of our young and energetic team moving forward. Now, if you still want to go in and talk about it and have coffee like we planned on doing, I can do that, but if you'd just please submit your resignation, you know, that's the way we'll handle it..." Plaintiff said that he did want to talk about it. Pickering said, "We're not just basing this on performance.... your energy level's just not what it should be." Pickering continued to push plaintiff to resign and if he did not, Pickering would put him before a review board of his peers. (pltf. depo. 96-99)

Plaintiff arrived home that day around 5:00 p.m. and immediately telephoned Juniper's Human Resources department and left a message. Ann LaPorte returned his call the next day and plaintiff informed her of the meeting with Pickering. Plaintiff told LaPorte that he had been asked to resign on the spot. LaPorte indicated to plaintiff that Juniper did not want him to resign. LaPorte then arranged a conference call with plaintiff and Pickering. During that conversation, Pickering admitted that he had made a mistake, that he tried to get rid of plaintiff and would make things work out. (*Id.* 101-107)

LaPorte's testimony regarding the January 13 events is as follows. After speaking with plaintiff, LaPorte immediately telephoned Pickering, whose version of the meeting was the same as plaintiff. After speaking with Pickering,

> we set in motion a reversal of what had been communicated to [plaintiff] and stated to Mr. Pickering and Mr. Sjobakken that - - that we would no longer go down a performance improvement path with [plaintiff]. That we needed to ensure that [plaintiff] was set up for success and that there were to be no ramifications against [plaintiff] as a result of the reversal.

During her telephone conversation with plaintiff, LaPorte told him "what you were told is not accurate. It's not Juniper-sanctioned. It's not in place and we are going to do a follow-up call

4

with [Pickering] so that you can also hear it directly from him..."  During that subsequent phone conversation, Pickering "talked directly to [plaintiff] and did a reversal with [LaPorte] on the phone."  According to LaPorte, Pickering should never have presented the approved PIP without an agreement from Human Resources as to a method of delivery to plaintiff. Furthermore, in accordance with Juniper's "performance management," an employee should never be presented with the choice of resigning or accepting the PIP.  An employee should never be given the choice of resignation. (LaPorte depo. 48-49, 90, 92-106, 187)

Plaintiff also testified that in his initial conversation with LaPorte, he did not tell her of specific age-related remarks.  LaPorte testified that in her first conversation with plaintiff following his meeting with Pickering, plaintiff did not talk about age discrimination.  In her follow-up conversation with Pickering, the latter indicated to LaPorte that plaintiff stated that he thought Pickering's action was due to plaintiff's age. LaPorte did not address this issue with plaintiff. In an e-mail directed to LaPorte and Balkus wherein Pickering recounted the events of the January 13 meeting with plaintiff, he states that plaintiff told him, "This was about the age thing.  It's because I'm 50."   (Laporte depo.143-144; 198-200; pltf. depo. 104; Doc. 28 Ex. 1)

Apparently, the PIP was never instituted.  (Balkus depo. 34-36) A week after the January 13 meeting, plaintiff attended a national sales meeting and he "felt like a pariah," "felt shunned." He testified that Sjobakken "totally ignored" him, and "management knew what had happened." (pltf. depo. 120)

According to Kevin Hollenbach, Juniper's current Vice President of West Area Enterprise and previous Sales Director for the Enterprise Sales team for the Central Region,

5

Juniper underwent a reorganized sales structure in early 2005 to integrate the sales forces of Juniper and Netscreen as well as Neoteris, which had been acquired by Netscreen prior to Juniper's acquisition of Netscreen.  Juniper shifted its enterprise sales operations to a major account model and a territory model.  In general, former Neoteris salespeople became Major Account Managers (MAMs), with only 15 or 20 major accounts, and former Netscreen salespeople (like plaintiff) became Territory Account Managers (TAMs), who were given a specific geographic territory in which they could call on any accounts except the major accounts which fell within that territory.  Neither the TAMs nor the MAMs were happy with the reorganization.  (Hollenbach decl.; Hollenbach depo. 55, 81-86, 95)

Pickering and Sjobakken identified the major account lists and the TAMS for plaintiff's sales region.  By e-mail of Friday, January 28, 2005, Pickering, as Regional Sales Manager for the North Central Region, notified his direct reports in Ohio of the reorganization plan and their assigned roles. Tony McIlvenna (a former Neoteris salesperson) was to assume the role of MAM, with 23 named major accounts. Plaintiff became a TAM covering the same territory he had before with the exception of the accounts assigned to McIlvenna.  A third salesperson, Tim Cornett, also became a TAM covering his same territory less the accounts assigned to McIlvenna.  (Pickering depo. 118; Doc. 28 Ex. 24)

Plaintiff immediately contacted Pickering to raise his concerns about the list.  (Doc. 28 Ex. 34) Many of the accounts transitioned to McIlvenna were considered plaintiff's "lifeblood" accounts and were accounts that plaintiff had developed good working relationships with.  Plaintiff was concerned that he would be unable to meet his sales quota in the future.  Plaintiff also contacted LaPorte in Human Resources upon receiving the January

6

28 e-mail.  (pltf. depo. 155) In response to plaintiff's concerns that certain accounts had been taken away from him, LaPorte assured plaintiff that Sales Operations and Finance would review the accounts and how they were split up to ensure that it was done fairly.  The review concluded that the allocation was equitable. (LaPorte depo. 131-133)

Pickering and Sjobakken made several changes to the Ohio major account list after the January 28 notification, and the list was not finalized until months later.  (Hollenbach depo. 87; Pickering depo. 143-144) Two of plaintiff's accounts, Progressive and National City, were transitioned back to plaintiff on February 7, 2005.  (Doc. 28 Exs. 35, 36) Two other accounts that plaintiff considered "significant revenue generators," however, remained with McIlvenna.

Plaintiff went on a medical leave beginning Sunday, January 30, 2005 for surgery to repair a hernia. (pltf. depo. 153; Doc. 28 Ex. 37; Doc. 20 Ex. T) The account restructuring moved forward in his absence.  During his leave, plaintiff had his wife read his office e-mails and instructed her as to the response he wanted given.  (pltf. depo. 179)  Plaintiff returned to work on March 14, 2005, and then went on vacation from March 21-29.  (*Id.* 238)

In mid-February 2005, Juniper terminated the employment of Pickering and Sjobakken.  (LaPorte depo. 225-226)  Kevin Hollenbach (DOB 6/29/60) was appointed Regional Sales Director of the Central/Mountain States region.  (Hollenbach decl.; Doc. 20 Ex. W) Upon his return to work in March 2005, plaintiff requested that Hollenbach, his new supervisor, review the major account list.  Hollenbach declined to do so, stating that he had no input in the creation of the list and it was not up for negotiation.  (pltf. depo. 244-245; Doc. 28 Ex. 40)  Hollenbach testified that most of the people on the sales team were dissatisfied with

the list and he was not changing it at that point because "We needed to move forward.  If I was going to make changes it was going to be after I got to know the team.  That wasn't the time to assign accounts again when they were just shuffled in January."  (Hollenbach depo. 95-97)

Also upon his return to work, Hollenbach put plaintiff on what plaintiff characterizes as a verbal 30-day plan to show how he was going to secure business on his accounts. Plaintiff considered the plan "unreasonable."  (pltf. depo. 246) Hollenbach testified

> One of the practices I followed while Sales Director for the Central Region was to have each of the sales people reporting to me put together 90-day forecast plan that we called a Quarterly Business Review.  In March 2005, when [plaintiff] returned from medical leave, I asked him to do the same.  This request was not unique to [plaintiff].

(Hollenbach decl.)

By letter of March 16, 2005 to Juniper, counsel for plaintiff complained of Juniper's treatment of plaintiff regarding the assignment of the accounts, and stated that Hollenbach's actions toward plaintiff violated the FMLA and Juniper's actions were in retaliation for plaintiff's earlier age discrimination allegations. By letter of April 4, 2005, Juniper's counsel denied the contentions.  (Doc. 28 Exs. 42, 43)

On April 6, 2005, plaintiff notified Hollenbach and LaPorte, by e-mail, that he had been "constructively discharged."  (*Id.* Ex. 44) Immediately prior to submitting this e-mail, plaintiff had been contacted by another company and had accepted employment.  (pltf. depo. 59-61)

Plaintiff thereafter filed this Complaint setting forth four claims. Count One alleges age discrimination pursuant to Ohio Revised Code §§ 4112.02 and 4112.99.  Count Two alleges retaliation under Ohio law.  Count Three alleges a violation of public policy.  Count

8

Four alleges intentional infliction of emotional distress.  Although this Complaint was originally filed in the Lake County Court of Common Pleas, the matter was removed to this Court on the basis of diversity of citizenship.

This matter is now before the Court upon defendant's Motion for Summary Judgment.

**Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party.  Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of [his] pleadings, but [his response], by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is genuine issue

9

> for trial. If he does not respond, summary judgment, if
> appropriate, shall be entered against him.

The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party. *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir. 1985). However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

## **Discussion**

### **(1) Count One**

Count One alleges age discrimination pursuant to Ohio Revised Code §§ 4112.02 and 4112.99.

The test developed to resolve age discrimination claims under the federal Age Discrimination in Employment Act (ADEA) is also applied to age discrimination claims filed pursuant to Ohio law. *Campbell v. International Paper Co.*, 138 Fed.Appx. 794, 796 (6th Cir.

10

2005) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 357-58 (6th

Cir.1998).) ("The same test applies to both the plaintiffs' ADEA and their Ohio

age-discrimination claims." )

The burden-shifting evidentiary framework originally articulated in *McDonnell*

*Douglas Corp. v. Green,* 411 U.S. 792, 802-05, 93 S.Ct. 1817, 1824-26, 36 L.Ed.2d 668

(1973) and later refined in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248,

256-59, 101 S.Ct. 1089, 1095-97, 67 L.Ed.2d 207 (1981) is utilized in analyzing a claim of

age discrimination under the ADEA.

Accordingly, to establish a prima facie case in the absence of direct evidence, a

plaintiff must demonstrate that: "(1) he was at least 40 years old at the time of the alleged

discrimination; (2) he was subjected to an adverse employment action; (3) he was otherwise

qualified for the position; and (4) after he was rejected, a substantially younger applicant was

selected." *Burzynski v. Cohen*, 264 F.3d 611, 621-622 (6th Cir. 2001) (citing *Barnett v. Dep't*

*of Veterans Affairs*, 153 F.3d 338, 341 (6th Cir.1998)).  With regard to the fourth element,

plaintiff can also demonstrate that he was replaced by a person outside of the protected class

or, in a disparate treatment case, that he was treated differently than similarly-situated

individuals.  *Policastro v. Northwest Airlines, Inc.,* 297 F.3d 535 (6th Cir. 2002).

If a prima facie case is established, the burden of production shifts to the defendant to

articulate a non-discriminatory reason for its action.  If the defendant states such a reason,

"the plaintiff must then demonstrate by a preponderance of the evidence that the defendant's

proffered reason was a pretext for age discrimination." *Burzynski,* 264 F.3d at 621-622.  In

order to demonstrate pretext, "plaintiff must produce sufficient evidence from which the jury

could 'reasonably reject the defendant's explanation' and infer that [defendant] 'intentionally discriminated' against him." *Leonard*, 6 Fed.Appx. at 228 (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 519, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ). As recognized by the Sixth Circuit, "[t]he Supreme Court recently held that a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* (quoting *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000) ). Finally, *Manzer, supra*, reiterated that pretext may be proven by setting forth evidence "(1) that defendant's proffered reasons have no basis in fact, (2) that the proffered reasons did not actually motivate the discharge, or (3) that they were insufficient to motivate discharge." *Id.* (citing *Manzer,* 29 F.3d at 1084).

### (a) direct evidence

Plaintiff asserts that he has direct evidence of age discrimination. The Sixth Circuit has stated,

> A 'direct evidence' discrimination case requires proof which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions. Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group.

*Harris v. Giant Eagle Inc.*, 133 Fed.Appx. 288, 293 (6th Cir. 2005) (citations omitted). *See also Rowan v. Lockheed Martin Energy Systems, Inc.,* 360 F.3d 544 (6th Cir. 2004) ("Direct evidence is evidence that proves the existence of a fact without requiring any inferences.")

In *Peters v. Lincoln Electric Co.,* 285 F.3d 456, 477-478 (6th Cir. 2002) (citing *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325 (6th Cir.1994) ), the Sixth Circuit recognized

12

four factors to be evaluated in considering allegedly age-biased remarks:

> (1) whether the statements were made by a decision maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous, or isolated remarks; and (4) whether they were made proximate in time to the act of termination.

In *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344 (6th Cir. 1998), the Sixth Circuit thoroughly addressed the issue of age-biased remarks, albeit in the context of evidence of pretext rather than as direct evidence supporting a prima facie case. The Court stated, "In addressing the relevancy of a discriminatory remark, we look first to the identity of the speaker." *Id.* at 354. This Court must then "examine the substance of the discriminatory remarks in determining their relevancy to a plaintiff's claim that an impermissible factor motivated the adverse employment action..." In this regard, the court reviewed previous case law addressing this issue and recognized:

> Isolated and ambiguous comments 'are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination.' *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir.1993) (quoting *Gagne v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 314 (6th Cir.1989)). ... [Additionally,] [a]lthough we believe a direct nexus between the allegedly discriminatory remarks and the challenged employment action affects the remark's probative value, the absence of a direct nexus does not necessarily render a discriminatory remark irrelevant. *See La Pointe v. United Autoworkers Local* 600, 8 F.3d 376, 380 (6th Cir.1993) (supervisor's ageist remarks about 'oldtimers' constitute direct evidence of age discrimination even though the comments were not specifically about or directed to the plaintiff).

In *Ercegovich*, the court found that the decision maker's comments that "this company is being run by white haired old men waiting to retire, and this has to change" and that he did "not want any employee over 50 years old on his staff" were not ambiguous or abstract. The court stated, "Both remarks on their face strongly suggest that the speaker harbors a bias against older workers." *Id.* at 355. The court also stated, "when assessing the relevancy of

13

an allegedly biased remark where the plaintiff presents evidence of multiple discriminatory remarks or other evidence of pretext, we do not view each discriminatory remark in isolation, but are mindful that the remarks buttress one another as well as any other pretextual evidence supporting an inference of discriminatory animus." *Id.* at 356 (citations omitted).

Plaintiff herein asserts that he has direct evidence in the form of ageist comments made by management and co-workers. Plaintiff points to his own deposition testimony regarding comments allegedly made by Pickering, after he became plaintiff's manager in July 2004. Pickering would comment that plaintiff is the "older guy, he wants to go out and get his rest" when plaintiff did not go out and drink at sales meetings. At an October meeting, Pickering stated, "You probably don't want to join us, you're old. I mean, you probably got to go get your sleep, you're old." At the January 13 meeting, Pickering said, "You're not going to be part of our young and energetic management team moving forward." (pltf. depo. 81, 91) Plaintiff also points to Pickering's e-mail composed after the January 13 meeting wherein Pickering stated that he told plaintiff that "we've made a collective decision that we don't feel you are a strong, long-term fit for our organization based on your performance..." (Doc. 28 Ex. 1)

Additionally, plaintiff points to his testimony that other unidentified employees referred to him as "the old guy in the group, the guy with grey hair wants to go up to his room." (pltf. depo. 86) And Matt Albers (a systems engineer for Juniper) said in front of customers, "I brought the old guy with me today." (*Id.* 87, 88)

The Court will initially address the latter marks. The statements allegedly made by unidentified co-workers and by Matt Albers (also a co-worker) cannot constitute direct

14

evidence as these co-workers were not decision makers with regard to plaintiff's employment. *Preston v. Clayton Homes, Inc*., 167 Fed.Appx. 488, 492 (6th Cir. 2006) (citing *Johnson v. Kroger Co.*, 319 F.3d 858, 868 (6th Cir.2003) ) ("Remarks made by an individual who has no authority over the challenged employment action are not indicative of discriminatory intent.") As such, these are not direct evidence.  Moreover, plaintiff did not report age-related comments by his co-workers to defendant. (pltf. depo. 90-91, 95)

The Court will next consider Pickering's statements.

Pickering's assertion in the e-mail that plaintiff was not a "strong, long-term fit" is not probative of age discrimination.  Contrary to plaintiff's contention that "fit" obviously refers to plaintiff's age, this Court disagrees in that an inference is required to make such a conclusion.  Thus, this statement does not constitute direct evidence. *Kocak v. Community Health Partners of Ohio, Inc*., 400 F.3d 466, 470 (6th Cir. 2005) (citations omitted) ("Whatever the strength of the evidence, it is not 'direct' evidence if it admits more than one plausible interpretation, and requires a significant inference or presumption on the part of the trier of fact.")

Pickering's comments after July 2004 that plaintiff is the "older guy, he wants to go out and get his rest" when plaintiff did not go out and drink at sales meetings and that plaintiff did not want "to join us, you're old.  I mean, you probably got to go get your sleep, you're old" are not direct evidence of age discrimination because, while made by his direct supervisor, they were not made in connection with a decision of Juniper to take adverse actions against plaintiff.   In *Stefanski v. Grainger, Inc.,* 155 Fed. Appx. 177 (6th Cir. 2005), the Sixth Circuit found that comments by plaintiff's supervisor that plaintiff was "as old as

15

dirt," "sweated like an old man" and was "old news" were not direct evidence of age discrimination because they were not made in connection with defendant's decisions to take adverse actions against plaintiff although this supervisor had communicated his dissatisfaction with the supervisor who later initiated discipline against plaintiff.

Here, as discussed below (with regard to whether plaintiff suffered an adverse employment action), the January 2005 PIP was never instituted and Juniper immediately reversed the actions attempted to be taken by Pickering to get plaintiff to resign.  Also, while plaintiff asserts that Pickering's restructuring of the account list took away plaintiff's "lifeblood" accounts and plaintiff feared, as a result, that he would be unable to meet his sales quota in the future, plaintiff only worked about two weeks under the restructuring before submitting his "constructive discharge" notice.  Therefore, it is impossible to know whether the account restructuring was an adverse employment decision, materially affecting the terms of plaintiff's employment.

Moreover, Pickering was terminated by defendant in February 2005.  Plaintiff submitted his "constructive discharge" notification on April 6, 2005.  Thus, even assuming these statements show that Pickering harbored an age animus, his statements are too remote to be considered direct evidence.

Nor is the statement made by Pickering to plaintiff at the January 13 meeting that "You're not going to be part of our young and energetic management team moving forward" direct evidence.   While the comment was made in connection with Pickering's attempt to have plaintiff resign or be put before a review board of his peers, Juniper immediately reneged this threat and had Pickering admit his mistake to plaintiff.

16

For these reasons, the statements relied on by plaintiff do not constitute direct evidence of age discrimination.

Plaintiff additionally asserts that his disproportionately low compensation as compared to similarly-situated, younger Juniper employees in the Central States Region and the fact that Pickering and Sjobakken did not give plaintiff a compensation increase in February 2005[2], is direct evidence of age discrimination.  This Court agrees with defendant that the fact of plaintiff's compensation as compared to other employees would require multiple inferences and, therefore, cannot constitute direct evidence.

Having failed to establish direct evidence, plaintiff must establish his case through circumstantial evidence.

**(b) circumstantial evidence**

Defendant argues that plaintiff cannot establish the second element of the prima facie case, i.e., that he was subjected to an adverse employment action.  For the following reasons, this Court agrees.

The January 13 meeting did not constitute an adverse employment action.  The PIP that Pickering and Sjobakken attempted to give plaintiff was never instituted.  Furthermore, according to the testimony of plaintiff and Ann LaPorte, Pickering's effort to get plaintiff to resign was immediately reversed by Juniper through plaintiff's telephone conversation with LaPorte.  Pickering also admitted his mistake and agreed to work things out with plaintiff.

---

[2]     In support of his assertion that he was passed over for a compensation increase, plaintiff relies on documentation which, as defendant points out, has not been authenticated so as to be considered competent summary judgment evidence.  *See* F.R.C.P. 56(c).

17

While plaintiff states that he was made to feel like a "pariah" at the next meeting, an adverse employment action is "a materially adverse change in the terms of ... employment." *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 795 (6th Cir.2004) (citing *Kocsis v. Multi-Care Mgmt., Inc*., 97 F.3d 876, 885-87 (6th Cir.1996)). A "mere inconvenience or an alteration of job responsibilities or a bruised ego is not enough to constitute an adverse employment action." *Id.* (citation and internal quotation marks omitted).  Thus, assuming it is true that plaintiff felt shunned, he has not demonstrated a materially adverse change in the terms of his employment as a result.

Nor does plaintiff show, as discussed below, that the account restructuring was an adverse employment action.

Plaintiff asserts that he satisfies the adverse employment action prong by demonstrating that he was constructively discharged.  For the following reasons, this Court disagrees.

A plaintiff may establish an adverse employment action by demonstrating that he was constructively discharged. *Logan v. Denny's, Inc.*, 259 F.3d 558 (6th Cir. 2001 To demonstrate a constructive discharge, a plaintiff must produce evidence demonstrating that 1) the employer  deliberately created intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit.... *Id.* (citations omitted) *See also Mauzy v. Kelly Services, Inc.,* 75 Ohio St.3d 578 (1996) ("Courts generally apply an objective test in determining when an employee was constructively discharged, viz., whether the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign.")

18

Plaintiff asserts that any reasonable person would have perceived his work environment to be intolerable as evidenced by the following.  Plaintiff contends that his perception that he was not wanted at Juniper is objectively reasonable in that he had to tolerate Pickering's ageist comments and his actions surrounding the January 13 meeting. The subsequent telephone conference with Human Resources did little to alleviate plaintiff's concerns especially given that Human Resources had approved the PIP.  Plaintiff was treated like a pariah at the January 2005 national sales meeting.  Juniper left Pickering and Sjobakken in charge of the restructuring of plaintiff's accounts despite their earlier actions and plaintiff's input was not sought in the restructuring.  Juniper failed to address plaintiff's allegations of age discrimination despite being placed on notice of such by Pickering.  Finally, Hollenbach refused to discuss or consider plaintiff's request to review the account restructuring.

Despite plaintiff's subjective feeling that Juniper wanted him out, the evidence shows that when Pickering pushed plaintiff to resign, Juniper clearly advised plaintiff that it did not want plaintiff to resign and it would "no longer go down a performance improvement path." Human Resources also arranged the conference call with plaintiff and Pickering wherein Pickering admitted that he had made a mistake, that he tried to get rid of plaintiff and would make things work out.  Thus, the evidence does not show that it was defendant's intention to force plaintiff to quit.  Furthermore, Pickering, whose ageist comments plaintiff was allegedly subjected to, and Sjobakken, who approved of Pickering's decision to get rid of plaintiff, were terminated nearly two months prior to plaintiff's "constructive discharge."[3]

---

[3]     LaPorte testified that Pickering's treatment of plaintiff with regard to the way he attempted to present the PIP "pushed us over the edge and clearly made an easy decision to terminate him..."  (LaPorte depo. 84)

19

While plaintiff asserts that defendant did not address his age discrimination claims, plaintiff admits that he did not notify LaPorte of specific age-related remarks, but that LaPorte learned of the allegations through Pickering.  Nonetheless, plaintiff does not assert that any age-related statements were made to him after the January 13 meeting.  Certainly, plaintiff does not complain that his new supervisor, Hollenbach, made any age-related comments.  Thus, after LaPorte reversed the actions taken at that meeting, there is no evidence that age bias existed to make plaintiff's work environment intolerable.  Furthermore, LaPorte believed that she had dealt with the allegation of age discrimination in resolving the whole issue of the January 13 meeting.  LaPorte testified that after learning from Pickering that plaintiff believed his age was a factor, LaPorte did not "follow up" with plaintiff because she "didn't think it was important at this point in time given the actions that were taken, that we were dealing with the situation in totality."  (LaPorte depo. 143-145)

Plaintiff also contends that Juniper left Pickering and Sjobakken in charge of the restructuring of plaintiff's accounts, and they did not seek his input as they did from other employees.  However, the account list was published on Friday, January 28, 2005. Plaintiff went on a medical leave beginning Sunday, January 30, 2005.  The account restructuring moved forward in his absence.  Plaintiff returned to work on March 14, 2005, and then went on vacation from March 21-29. Plaintiff notified defendant of his "constructive discharge" on April 6, 2005.  The Court agrees with defendant that in the approximately 12 days plaintiff worked following the account reorganization, plaintiff presents no evidence that his working conditions were so intolerable that a reasonable person would have felt compelled to resign.

Plaintiff asserts that while defendant "terminated the discriminators," it left the

20

discriminatory status quo set against [plaintiff] in place"as evidenced by Hollenbach's refusal to discuss or consider plaintiff's request to review the account restructuring. (Doc. 28 at 26) There has been no evidence presented of a discriminatory status quo. Hollenbach is not alleged to have harbored any age animus.  Moreover, Hollenbach testified that most of the people on the sales team were dissatisfied with the list and he was not changing it until after he got to know the team.  Hollenbach also testified that he met with each of his 16 sales teams between March and May 2005.  (Hollenbach depo. 41)  Plaintiff did not return to work until late March and he resigned in early April. Thus, it does not appear that plaintiff gave the restructuring or Hollenbach a fair chance.

Finally, just prior to his "constructive discharge," plaintiff received an offer of employment with another company, earning a base compensation package similar to that earned at Juniper.  (pltf. depo. 23-24, 59-64) This further weakens plaintiff's argument that he felt compelled to resign due to the intolerable working conditions at Juniper.  *See Means v. Cuyahoga County Dept. of Justice Affairs,* 2006 WL 2298912 (Ohio 8th App. Dist. August 10, 2006) (Plaintiff had signed a letter of employment with another employer prior to submitting her resignation with defendant and she cannot now claim that she was forced to resign.)

For these reasons, the Court finds that the January 13 meeting and the account restructuring do not constitute adverse employment actions, and plaintiff was not constructively discharged.

Plaintiff additionally presents a list of what he considers adverse employment actions by Juniper:

> 1) Two weeks after Pickering became plaintiff's supervisor, he threatened to put him on a PIP if his sales performance did not improve.

21

2) Plaintiff was required to meet higher sales quotas than other similarly situated younger account executives.

3) Pickering scolded plaintiff during sales team meetings.

4) Pickering began looking for plaintiff's replacement prior to any contact with Human Resources regarding plaintiff's alleged performance deficiencies.

5) Although, under Juniper's policy, the goal of a PIP is not to terminate an employee, when Pickering requested the proper "termination formalities" from Human Resources, the latter advised Pickering to put plaintiff on a PIP.

6) Pickering failed to follow any of Juniper's procedures for delivering a PIP.  He gave plaintiff the option to resign, which was approved by Juniper's Vice-President of Americas Sales.

7) Juniper left Pickering and Sjobakken in charge of the restructuring of plaintiff's accounts despite their earlier actions and plaintiff's input was not sought in the restructuring.

8) Juniper failed to address plaintiff's allegations of age discrimination despite being placed on notice of such by Pickering.

9) Knowing that plaintiff was on FMLA leave, Pickering told plaintiff to work out the transitioning of his accounts to McIlvenna by the end of February.  The account transition proceeded without plaintiff's input.

10) While on medical leave, plaintiff was chastised by Pickering for failing to prepare a weekly sales report prior to his departure.

11) Upon return from FMLA leave, Hollenbach refused to discuss plaintiff's concerns regarding the account restructuring and, instead, placed plaintiff on notice that he had 30 days to submit a sales plan.  Plaintiff interpreted this as being placed on a verbal PIP.

For the following reasons, this Court disagrees that these amount to adverse employment actions.

The actions asserted in numbers two, seven, nine and eleven relate to plaintiff's working conditions.  However, none of these actions amount to an adverse employment action because they do not involve "a significant change in employment status, such as hiring,

22

firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Mazumder v. University of Michigan*, 2006 WL 2310822 (6th Cir. Aug 9, 2006) (citations omitted) The decision must have a tangible impact on plaintiff's employment.  *Plautz v. Potter,* 156 Fed. Appx. 812 (6th Cir. 2005). "Likewise, simply because an employee is made unhappy by an action does not mean that he has identified an adverse employment action."  *McMillan v. Potter,* 130 Fed. Appx. 793 (6th Cir. 2005) (citing *Primes v. Reno,* 190 F.3d 765 (6th Cir. 1999).  Additionally, with regard to his assertion that he had a higher sales quota, plaintiff testified that as of January 2005, everybody had the same quota.  (pltf. depo. 112)  Further, with regard to the account restructuring, plaintiff had worked such a minimum amount of time following the transitions, that it is impossible to tell whether the restructuring actually resulted in a diminished salary.

Moreover, "a bruised ego " does not amount to an adverse employment action. *Mazumder*, *supra* (citing *White, supra*) This renders numbers three and ten, above, as not being adverse employment actions.  *See also McMillan v. Potter,* 130 Fed. Appx. 793 (6th Cir. 2005) (Humiliation is not an adverse employment action.)

Number one, above, does not involve an adverse employment action because even a threat to discharge is insufficient to meet the requirement.  *Plautz v. Potter,* 156 Fed. Appx. 812 (6th Cir. 2005).

Numbers four, five and six are not adverse employment actions because plaintiff was not asked to resign and Juniper reversed Pickering's actions.  *See also McMillan, supra* (A proposed letter of warning was not an adverse employment action where no further disciplinary action was ever instituted and the letter was ultimately removed from plaintiff's

23

personnel file.)

Lastly, number eight has been discussed above.

For all of the above reasons, plaintiff fails to satisfy the second prong of his prima facie case.  Having failed to do so, the Court need not proceed further as plaintiff cannot demonstrate age discrimination.

Assuming plaintiff has satisfied the prima facie case[4], defendant asserts it had legitimate, non-discriminatory reasons for its actions.   Juniper's sales territory assignment to plaintiff in January 2005 was part of a company-wide sales reorganization that affected Juniper's entire sales force.  Kevin Hollenbach made the decision not to revisit plaintiff's assignment because he was new in his position and was not going to make any changes until he had an opportunity to observe the territory.  Plaintiff asserts this is pretextual, recounting the arguments set forth above regarding adverse employment action.  Ultimately, however, plaintiff submitted his "constructive discharge" shortly after returning to work after being out on medical leave and vacation.  Essentially, plaintiff did not work under the new account restructuring.  Further, there has been no evidence presented that plaintiff's new supervisor, Hollenbach, harbored any age animus toward plaintiff. Plaintiff points to no evidence of age-related statements made any later than January 13, 2005.  In fact, it appears that Hollenbach never met plaintiff. (Hollenbach depo. 148)

For these reasons, summary judgment is warranted as to Count One.

---

[4]    This Court agrees that plaintiff has satisfied the fourth prong of the prima facie case.  After plaintiff was no longer employed by defendant, Josh Nowak (DOB 1/10/70) was eventually hired for plaintiff's position.  (Doc. 28 Ex. 23)

**(2) Count Two**

Count Two alleges retaliation under Ohio law.  Plaintiff argues that he complained to his supervisor, Pickering, of age discrimination.  Defendant's Human Resources department had knowledge of the allegations based, at a minimum, on Pickering's statements regarding his January 13 meeting with plaintiff.

Ohio Revised Code, § 4112.02(I) prohibits discrimination against an employee who has opposed any unlawful discriminatory practice.  To establish a prima facie case of retaliation, plaintiff must prove that (1) he engaged in protected activity, (2) he was subjected to an adverse employment action, and (3) a causal link exists between a protected activity and the adverse action.  *Crable v. Nestle USA, Inc*., 2006 WL 1555405 (Ohio App. 8th  Dist. June 8, 2006) (citations omitted).

For the reasons stated above, plaintiff fails to demonstrate that he was subjected to an adverse employment action.  Thus, this claim fails because plaintiff cannot establish a prima facie case.

**(3) Count Three**

Count Three alleges a violation of public policy.  The parties disagree as to whether plaintiff may allege a public policy claim where relief is available for age discrimination under Ohio Revised Code §§ 4112.02 and 4112.99.  The Court need not decide this issue because, in any event, plaintiff is unable to establish a prima facie case of discrimination and it follows that his public policy claim fails as well.  *Means*, *supra* (citations omitted).

**(4) Count Four**

Count Four alleges intentional infliction of emotional distress.

25

Under Ohio law,

> To establish a claim for intentional infliction of emotional distress, the plaintiff must prove: (1) that the defendant either intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional distress, (2) that the defendant's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it would be considered utterly intolerable in a civilized community, (3) that the defendant's actions were the proximate cause of plaintiff's psychic injury, and (4) that the mental distress suffered by plaintiff is serious and of such a nature that no reasonable person could be expected to endure it.

*Crable v. Nestle USA, Inc*., 2006 WL 1555405 (Ohio App. 8th Dist. June 8,2006).  "Liability for intentional infliction of emotional distress will only be found in the most extreme circumstances."  *Id.*  Further, where there is no evidence that plaintiff suffered a "severe and debilitating" emotional injury, summary judgment is appropriate.  *Id.*

Defendant asserts that plaintiff has presented no evidence of extreme or outrageous conduct, or that he suffered a psychic injury.  Plaintiff submits his affidavit wherein he avers, "Juniper's actions towards and long-term treatment of me during my employment with Juniper, resulting in constructive discharge, caused serious stress and mental anguish to myself and my family."  (pltf. aff. ¶ 7) Plaintiff, however, states in his answers to defendant's interrogatories that "in the last year, he has not sought nor received treatment for any emotional or mental condition."  (Doc. 24 Ex. Q) Because there is no evidence that plaintiff suffered a "severe and debilitating" emotional injury, summary judgment is appropriate as to this claim.  *See Alam v. Chemstress Consultant Co.*, 2005 WL 156722 (Ohio App. 9th Dist. January 26, 2005) (Where the plaintiff has offered no evidence that he has suffered serious emotional injury which would be both severe and debilitating due to defendant's alleged acts, and plaintiff has not sought the care of a psychologist or psychiatrist, summary judgment is

26

proper on intentional infliction of emotional distress claim.)

Accordingly, summary judgment is warranted as to Count Four.

**Conclusion**

For the foregoing reasons, defendant's Motion for Summary Judgment is granted.

IT IS SO ORDERED.




             /s/ Patricia A. Gaughan
             PATRICIA A. GAUGHAN
             United States District Judge

Dated: 9/6/06